THOMPSON, APPELLANT, *v.* BARTON GULCH MINING CO., RESPONDENT.

(No. 4,732.)

(Submitted March 17, 1922.  Decided May 1, 1922.)

[207 Pac. 108.]

*Mines and Mining—Adverse Suit—Location of Claims—Statutory Provisions—Substantial Compliance Necessary—Excess Territory—Right of Subsequent Locators to Excess.*

Mines and Mining—Adverse Claim—Location of Claim—Statutory Provisions—Substantial Compliance Necessary.
   1.  The provisions of section 7365, Revised Codes of 1921, calling for the posting of a notice of location of a quartz lode mining claim containing a statement of the number of feet claimed along the

---

1.  The authorities discussing the question as to posting of notice of location of mining claim are collated in a note in 7 L. R. A. (n. s.) 832.

course of the vein from the point of discovery, and of section 7366, requiring the recordation of a certificate of location in the office of the county clerk showing the direction and distance claimed along the course of the vein, *etc.*, must be substantially complied with.

Same—Boundaries of Claim—Degree of Definiteness Required—Declaratory Statement—Contents.

2. The boundaries of a mining location must be so definite and certain that, taking the discovery as the initial point, they may be readily traced, and the declaratory statement must furnish such information that a person of reasonable intelligence may therefrom find the claim and run its lines.

Same—Area of Claim—Notice to Subsequent Locators.

3. The area bounded by a mining location must be within the limits granted by the statute—1,500 feet in length by 600 in width—and boundaries beyond such limits do not impart notice to subsequent locators, they not being required to look for stakes or boundaries beyond such limits.

Same—Excess Territory Included in Location—Validity of Subsequent Location of Excess.

4. In his recorded certificate of location of a quartz lode mining claim the locator had stated that he claimed 1,000 feet in a southerly direction from the discovery shaft and 500 feet in a northerly direction. As staked upon the ground the length of the claim was 1,675 feet,—1,283 feet thereof being in a southerly direction from the discovery shaft. Fifteen years later, upon survey prior to application for patent an amended certificate was filed changing the boundaries so as to shorten the distance given in the original certificate of location by 108 feet northerly and lengthening the distance southerly by that many feet, thus including ground which had theretofore been located by another who had found valuable deposits thereon. *Held,* in an action to determine the conflict, that the recitals in the recorded declaratory statement were controlling as to the distance claimed by the locator along the course of the vein, in the absence of actual knowledge on the part of the subsequent locator of the position of the corners; that in view of the excessive length of the claim as originally staked it was unjust to permit the defendant, successor of the original locator, to amend his location so as to include the area in conflict, and that the trial court erred in entering judgment for defendant.

*Appeal from District Court, Madison County; Wm. A. Clark, Judge.*

ACTION by W. O. Thompson against the Barton Gulch Mining Company. Judgment for the defendant, and the plaintiff appeals. Reversed and remanded, with directions to enter judgment in favor of plaintiff.

---

4. On effect of successive locations of mining claim, see notes in 7 L. R. A. (n. s.) 763 and 28 L. R. A. (n. s.) 1029.

. *Messrs. Pray & Callaway* and *Mr. H. P. Beckett,* for Appellant, submitted a brief; *Mr. Lew. L. Callaway* argued the cause orally.

Plaintiff had the right to measure the distance from the discovery shaft following the calls of· defendant's notice and to locate the excess. (*Hauswirth* v. *Butcher,* 4 Mont. 299, 1 Pac. 714; *Leggatt* v. *Stewart,* 5 Mont. 107, 2 Pac. 320; *Leveridge* v. *Hennessey,* 48 Mont. 58, 135 Pac. 906; *Flynn Group Mining Co.* v. *Murphy,* 18 Idaho, 266, 138 Am. St. Rep. 201, 109 Pac. 851; affirmed in *Swanson* v. *Koeninger,* 25 Idaho, 361, 137 Pac. 891.)

*Mr. M. M. Duncan,* for Respondent, submitted a brief and argued the cause orally.

Has the respondent the right to hold under the Marietta location 1,108 feet in length southwesterly from the discovery? In considering this question it must be borne in mind that this fifty-three hundredths of an acre of ground in controversy is within the boundaries of the Marietta claim, as surveyed for patent, and that the same is not any part of an excessive claim or location. It is, however, a tract of ground lying mostly beyond the 1,000 foot mark from the point of discovery. The locators claimed for this claim in their notice 1,000 feet in a southwesterly direction and 500 feet in a northeasterly direction. The distance to patented ground in a northeasterly direction proved to be only 392 feet, hence the surveyor extended the claim in a southwesterly direction from the discovery 108 feet farther than the 1,000 feet marked as claimed in the location notice, but all of which said 108 feet was still within the original corners. Was this permissible? The respondent contends that in this case it was, for the reason that this 108 feet was within the corners as marked on the ground, as by including it in the survey it only gave the respondent its full claim in length of 1,500 feet. In other words, the

respondent contends that as its claim was distinctly marked on the ground by monuments, it had the right to this 108 feet, in order to make up a full claim.

The only case which the respondent has been able to find wherein the court ever intimated that this was not permissible is that of *Flynn Group Mining Co.* v. *Murphy,* 18 Idaho, 266, 109 Pac. 851, wherein that court said that the locator is bound by his notice as to the distance each way from the discovery, and not by the monuments of the ground. However, the same court discredited this decision later in *Swanson* v. *Koeninger,* 25 Idaho, 361, 137 Pac. 891.

In regard to the question as to the rights of the public to go upon a mining claim, excessive in size as marked on the ground, and locate the excess, the respondent calls attention to the following proposition of law, and authorities in support thereof, to wit: ''Where a mining claim for twenty years actually included twenty-two acres, but it appeared that the locators had acted in good faith, it was held invalid only to the extent of the excess, and until the locators were given notice of the excess, and an opportunity to cast off, it was held, that such excess was segregated from the public domain and exempt from relocation.'' (*Jones* v. *Wild Goose Min. Co.,* 177 Fed. 95, 29 L. R. A. (n. s.) 392, 101 C. C. A. 349; *Waskey* v. *Hammer,* 170 Fed. 31, 95 C. C. A. 305; *Zimmerman* v. *Funchion,* 161 Fed. 859, 89 C. C. A. 53; *McIntosh* v. *Price,* 121 Fed. 716, 58 C. C. A. 136; *Creede & Creek M. & M. Co.* v. *Uinta etc. Co.,* 196 U. S. 337, 49 L. Ed. 501, 25 Sup. Ct. Rep. 226 [see, also, Rose's U. S. Notes].)

The owner may hold his full claim when it is too long in one direction and too short in the other direction, according to the stakes on the ground, provided he keeps within his stakes and no bad faith or fraud appears, in view of the decision in *Swanson* v. *Koeninger, supra,* and in view of the well-established rule that the monuments on the ground govern rather

than the meets and bounds given in the certificate of location
or other writing. (27 Cyc. 574; *Pollard* v. *Schively,* 5 Colo.
309, 2 Morr. Min. Rep. 329; *Steen* v. *Wild Goose Min. Co.,*
1 Alaska, 255; *Meydenboeaur* v. *Stevens,* 78 Fed. 787, 11 Morr.
Min. Rep. 578.) ''As against subsequent locators it is a
sufficient compliance with the law when the location is dis-
tinctly marked on the ground so that its boundaries can be
readily traced.'' (*Book* v. *Justice Min. Co.,* 58 Fed. 106, 17
Morr. Min. Rep. 617; *Haws* v. *Victory C. Min. Co.,* 160 U. S.
303, 40 L. Ed. 436, 16 Sup. Ct. Rep. 282 [see, also, Rose's
U. S. Notes]; *Goldcreek Antimony M. & S. Co.* v. *Perry,* 94
Wash. 624, 162 Pac. 996.)

In the case at bar, it clearly appears that the appellant
was well acquainted with the Marietta claim, and knew its
general location long before he located the Metalic claim; that
if he did not know where the corners of this Marietta claim
were located, it was simply because he made no effort to locate
same; and in view of these conditions and this knowledge,
which the appellant had, or could have easily secured, and in
view of the provisions of section 2293, Revised Codes, and the
decision in the case of *Heilman* v. *Loughrin,* 57 Mont. 380,
188 Pac. 370, the respondent contends that it is entitled to
hold under the Marietta location 1,500 feet along the vein,
and surface ground as claimed in its answer, including the
fifty-three hundredths of an acre in controversy.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an adverse action involving a conflict in the mining
locations of the plaintiff and the defendant, comprising fifty-
three one-hundredths of an acre. The plaintiff rests his claim
to the area in conflict upon a location by him made September
1, 1915, of ''the Metalic quartz lode, mining claim,'' and
the defendant bases its right thereto upon a location made
June 2, 1903, by its predecessors in interest, of ''the Mari-
etta quartz lode mining claim.'' The action was instituted to

determine the conflict in consequence of the defendant having applied for patent to "the Marietta claim." The case was tried before the court without a jury, and resulted in findings of fact and conclusions of law in favor of the defendant, upon which judgment was entered. The appeal is from the judgment.

Many errors are assigned by the plaintiff, all of which may be resolved into the single question whether the court erred in its findings of fact and conclusions of law.

There is no conflict in the evidence. It appears that the Marietta claim was located June 2, 1903, by the predecessors in interest of the defendant company, William Hill, John A. Jordan, and Bert Ferguson, and that in staking the claim on the ground after discovery made the locators made an excessive location of 175 feet in length and about seventy-five in width. (Rev. Stats. U. S., sec. 2320 [U. S. Comp. Stats., sec. 4615; 6 Fed. Stats. Ann., 2d ed., p. 512].) In the declaratory statement recorded in the office of the county clerk and recorder of Madison county, the locators claimed "500 feet in a northeasterly direction and 1,000 feet in a southwesterly direction, along the course of the lead from the point of discovery, where a notice of this location is posted, and 300 feet on each side from the middle or center of said lode or vein at the surface, comprising in all 1,500 feet in length along the course of said vein or lode, and 500 (600) feet in width." On December 28, 1903, Bert Ferguson conveyed his interest in the Marietta claim to Dewey Davies, and on March 6, 1909, William Hill made like conveyance to Davies. Thus Dewey Davies became the owner of an undivided two-thirds interest in the Marietta claim. John A. Jordan left the state, and Dewey Davies entered into the sole and exclusive possession of the property. Davies was living upon or near the claim in August, 1915, doing assessment work, and the plaintiff, W. O. Thompson, was camped a short distance away. The plaintiff prospected the ground to the south of the "Mari-'

etta'' claim, and with the assistance of Dewey Davies sunk a discovery shaft, posted notice of discovery, and marked on the ground the exterior boundaries of the claim by him named and designated as ''the Metalic quartz lode mining claim.'' In the recorded certificate of location of this claim it is recited: ''The adjoining claims are as follows: On the north the Marietta lode claim.  *  *  *  The course of the vein or lode is northerly and southerly, along which the undersigned (plaintiff Thompson) claims 1,280 feet in a southerly direction and 220 feet in a northerly direction from the discovery shaft, together with surface area 300 feet on the east side and 300 feet on the west side of the center of said vein, comprising a tract of 1,500 by 600 feet in size.''

At the time of the location of the ''Metalic'' claim, the plaintiff talked with Mr. Davies, stating that he (plaintiff) did not wish to encroach upon the Marietta claim, and Davies, who was familiar with the corners of the ''Marietta'' claim, said the ground was open public domain, and exhibited to the plaintiff the original declaratory statement of the ''Marietta'' claim, which had been recorded in the office of the county recorder. As to the location of the ''Metalic'' claim, made by the plaintiff, Dewey Davies, as a witness for the plaintiff, testified in part as follows: ''Q. Are you acquainted with the Marietta lode mining claim? A. Yes, sir. Q. And also the Metalic? A. Yes, sir. Q. Do you recall whether you were upon the Marietta ground in the year 1915? A. Yes, sir. Q. Did you see Mr. Thompson during the month of August that year? A. Yes, sir. Q. At that time were you living upon the ground of the Marietta claim? A. I was doing my assessment work. Q. Were you at that time in the sole and exclusive possession of the ground? A. Yes, sir. Q. How long have you been the owner of it, if you were? A. From November, 1903. Q. Up to that time? A. Yes, sir. Q. How about Mr. Thompson coming there? Was he over on the ground with you? A. He was camped a short distance from

where I was working. Q. Did you at that time have the original declaratory statement of the Marietta which had been filed of record in the office of the county clerk? A. Yes, sir. Q. It was returned to you and in your possession? A. Yes, sir. Q. Tell the court whether you showed it to Mr. Thompson? A. Yes, sir. Q. You recall Mr. Thompson prospecting the ground southerly of the Marietta? A. I don't understand you. Q. Do you recall his prospecting the ground southerly of the Marietta? A. Yes, sir. Q. Tell the court whether you were familiar with his discovery shaft or not. A. I helpea him do some work on it. Q. What sort of a discovery did he make there? A. A shaft. Q. What, if anything, did he find in the discovery shaft? A. Gold. Q. You mean ore-bearing gold? A. Yes, sir. * * * Q. At the time he made his discovery, did you recall his having posted a notice of location on a tree near by the discovery shaft or not? A. Yes, sir. Q. Did he do that or did he not? A. Yes, sir. Q. He did? What, if anything, was done toward marking the boundaries of the Metalic? A. He put up his corners. Q. How far south or southerly from the Marietta discovery shaft was the north end line according to your claim in the recorded notice? A. 1,000 feet. Q. Did you and Bill do anything to determine where that northerly end line was? A. We measured it with a twenty-foot pole. Q. Who did that? A. I and Mr. Thompson together. Q. Will you tell the court your method of doing that? A. We used a twenty-foot pole and measured it down and leveled it up as near as we could 1,000 feet. Q. Was the country south of the 1,000 foot point claimed by anyone else prior to Mr. Thompson's location? A. No, sir. Q. It was open, unappropriated, public domain, was it? A. Yes, sir. Q. What, if anything, did you do to mark that end line between the two claims? A. I just drove a stake down. Q. Were you with Mr. Thompson at any time when he put up or located any corners? A. I helped him put up part of his corners.. Q. Which ones? A. His north end line

corners. Q. How did you determine that? What method did you employ to do that? A. We had the apex of the vein, and we just squared it off as near as we could with a box compass. Q. You ran at right angles from the strike of the vein? A. Yes, sir.''

And on cross-examination the witness testified in part as follows: ''Q. You knew where your corners were of the Marietta? A. Yes, sir. Q. You knew where both corners were? Did you show those to Mr. Thompson at that time? A. No, sir. Q. You just simply told him that you claimed 1,000 feet south? A. That is it. Q. You knew at that time where the southwest corner of the Marietta was, didn't you? A. Yes, sir. Q. And where the southeast corner was? A. Yes, sir. Q. And are they the same corners that you pointed out to Mr. Pennington? A. Yes, sir. Q. When he surveyed it— when Mr. Thompson made his location and you helped him dig his hole there—did you go to your corners at all? A. No. Q. You did not take Mr. Thompson up there? A. No. Q. You helped him put up the other corners that were put up by Mr. Thompson on all the corners? A. Yes, sir. Q. You helped him on all of them? A. On all of them.''

And on direct examination as a witness for the defendant, Davies testified: ''Q. You acquired the Marietta claim, did you, from certain parties? A. Yes, sir. Q. When did you first know the discovery of the Marietta? A. 1903. Q. Who was working it at that time? A. Hill and Jordan. Q. Where was that discovery with reference to the Snowdrift claim? A. The discovery was in a southerly direction from the side line of the Snowdrift. Q. About how many feet would you say? A. It was supposed to be 500 feet. Q. It was located that way? A. Yes, sir; it was located that way. Q. You did not help dig the discovery, did you? A. No, sir. Q. Was there anybody there at the discovery? * * * A. Yes, sir. Q. At the time you saw it? A. Yes, sir. Q. Whose names were signed to the certificate of location, do you know?

A. Bert Ferguson, W. A. Hill, and Jordan. Q. That notice said how much ground was claimed, did it? A. Yes, sir. Q. How much did it claim? A. Five hundred feet northerly and 1,000 feet southerly. Q. Did you know where the corners were at the north end? A. Yes, sir. Q. What was the northwest corner of that claim? A. One was a tree, and one was a post. Q. Which was a tree? A. The northwest. Q. What kind of a tree was it? A. Pine. Q. Was it marked? A. Yes, sir. Q. How was it marked? A. The northwest—I could not say what the numbers were. Q. And the other corners—how was the southeast corner of the claim marked? A. It was a pine tree. Q. A green tree? A. Yes, sir. Q. What size was that? A. About eight inches, I believe. Q. Was it marked? A. Yes, sir. Q. What was it marked? A. I could not see the marks on that. Q. It was blazed, was it? A. It had been blazed; yes, sir. Q. Did anyone point that corner out to you? A. One of the old men did. Q. Mr. Jordan and Mr. Hill were the old men? A. Yes, sir. Q. The southwest corner, how was that marked? A. That was a pine tree. Q. What kind of a tree? A. A pine tree. Q. Was it a live or a dead tree? A. It was a live one, I think. Q. And still alive, is it? A. No; it is dead. Q. Was both of those trees blazed? A. Yes, sir. Q. And marked? This last corner, did you notice the marks on it? A. You could not see the markings. Q. Did you ever re-mark it? A. No, sir. Q. You knew it was the corner, though? A. Yes, sir."

From the testimony of Davies and Thompson, it appears that at the time of the location of the "Metalic" claim, Thompson did not know the location of the corners of the "Marietta" claim, and that he placed entire reliance upon the declaratory statement of the "Marietta" claim exhibited to him by Dewey Davies and Davies' statements made at the time. The plaintiff, Thompson, testified that he did not know the location of the corners of the Marietta claim, and did not learn of their position on the ground until Mr. Pennington went there

to survey the "Marietta" claim for patent. He testified: "Q. You did not know where the end line of the Marietta was at that time? A. No, sir. I did not. Q. Did you ever know? A. I never did until Mr. Pennington came up and found them. Q. You never tried to find them, did you? A. There is several trees there in that vicinity that was squared up, old trees, and it was pretty hard to find out which one was the Marietta and which one was some other corner. Q. You did not go over to the southwest corner—a big dead tree—with 'Marietta' still marked on it? A. I did not know at that time that that was a corner at all. Q. But you found out later that it was, did you? A. Mr. Davies told me after he made the survey that that was his original corner."

By deed dated July 29, 1918, Dewey Davies conveyed the Marietta claim to the defendant, Barton Gulch Mining Company. The defendant company attempted by advertisement to obtain the title of John A. Jordan to this claim by declaration of a forfeiture of his interest therein for failure to perform or contribute to the performance of required annual representation work. In July, 1918, the defendant, being desirous of securing a patent to the Marietta claim, caused a survey thereof to be made by W. W. Pennington, a United States deputy mineral surveyor, who was assisted in the work upon the ground by Dewey Davies. In consequence of such survey, the defendant made and filed an amended certificate of location of the Marietta claim, December 14, 1918. By such amendment the boundaries of the claim as originally staked on the ground were changed, although remaining within the area as originally marked. By the amended location notice, 392 feet are claimed in a northeasterly direction, 1,108 feet in a southwesterly direction from the discovery shaft. It will be noted that the distance claimed to the north was thus shortened 108 feet, and this amount added to the distance south of the discovery shaft. The relative location and boundaries of the claims in alleged conflict, the area in dispute, and the original bound-

aries of the "Marietta" claim, and those after amendment of
the location, are well illustrated by the following diagram:

    The dotted lines show the original boundaries of the Marietta
claim, and the heavy lines show the amendment thereof after
survey.   The ribbed portion shows the area in conflict in this
action.   Mr. Pennington, as a witness for the defendant, tes-
tified: "Q. Did you find the corners there in 1918, when you
made the survey—the location corners?   A. Yes, sir.   Q. What
corners did you and Mr. Davies find on the ground, Mr. Pen-
nington?   A. All of them.   Q. All four of the corners?   Can
you tell us now what kind of a corner you found on the
northwest corner; was it a tree?   A. It was a pine tree.
Q. Was it blazed?   A. Yes.   Q. Did you notice any marks on
it at that time?   A. The markings were obliterated; you could

not tell what they were. Q. At the northeast corner of the claim what was there? A. A post. Q. Set in the ground? A. Yes, sir. Q. Did you notice whether there was any markings on that? A. There were markings, but you could not read them. Q. The southeast corner, did you find that? A. Yes, sir. Q. What was that? A. That was a pine tree. Q. How big was it? A. About ten inches, as I remember. Q. Was it blazed? A. Yes, sir. Q. Did you notice any markings on that? A. We could not make them out. Q. The southwest corner, did you find that? A. Yes, sir; that was a dead tree that had been broken off; it was about ten or twelve inches high. Q. Was that blazed? A. The bark was off, and it looked as if it might have been off for a good many years; I could not tell you whether it was blazed or not. Q. Was there any markings on it? A. No; I don't think there were; we could not decipher them. Q. You did not see any markings on that at that time? A. I don't remember the markings."

And further, on redirect examination, the witness testified: "Q. You say it is 675 feet from the southeast corner location of the Marietta to the southwest corner location of the Marietta? How far is it at right angles from one corner to the other, at right angles with the vein? A. About 650 feet. Q. How far is it from the northeast end line of the Marietta to the discovery shaft of the Marietta? A. Three hundred and ninety-two feet. Q. From the discovery of the Marietta to the southwest end line of the Marietta, will you give that? A. It is 1,108 feet from the discovery of the Marietta to the south end line. Q. As surveyed for patent? A. On the vein line. Q. As surveyed for patent? A. Yes, sir. Q. But as located, how far would it be? A. It would be 1,283 feet." And on recross-examination, he testified: "Q. Mr. Pennington, didn't you fix a 1,000 foot point from the shaft of the Marietta to the discovery shaft of the Metalic for Mr. Thompson? A. I believe I did. Q. And didn't he drive an iron pin there? A. I don't think he did at that time. I think I drove a stake there. Q. You had the discovery notice there, didn't you, the

declaratory statement? A. Yes, sir. Q. Tell the court why you did not run your end line through that 1,000 foot point, instead of the 1,108 foot point? A. Because I was trying to give my client all that he was entitled to. Q. In other words, you did that in order to give him the whole 1,500 feet on the line of the vein? A. Yes, sir. Q. At that time you were advised by Mr. Thompson that he claimed that land south of the 1,000 feet, and he wanted you to run the line through that? A. Yes, sir. I knew Mr. Thompson was claiming it beyond the 1,000 foot point. Q. When you found the claim on the ground as pointed out to you by Mr. Davies, the end lines were not parallel, were they? A. Very close. Q. The fact is, they were not parallel, were they? A. They were closer than ninety-nine per cent of the claims you find. Q. Please answer the question. They were not parallel, were they? A. No; I never found one that was. Q. What you did, you were doing as a United States deputy mineral surveyor? A. Yes, sir. Q. What you did was to make these end lines parallel as you could within the ground that you had, in order to comply with the instructions of the government, and thus give the claimant the extralateral rights? That is correct? A. Yes, sir. Q. I will ask you to tell the court if it is not a fact that it is not only permissible, but mandatory under the rules and form of the government, to always pull in end lines to make them parallel, if conditions permit? A. Yes, sir. You can always pull in. Q. If you don't encroach upon the rights of other people? A. Yes, sir. * * * Q. If you had run the claim 392 feet northerly from the discovery shaft, which you did, you would thus have been 108 feet short of the 500 feet claimed in the declaratory statement of your client, would not you? A. Yes, sir. Q. What you did was to simply put 108 feet on the 1,000 feet to make it 1,108; was it not? A. Yes, sir.''

The Marietta claim having been surveyed, application for patent was made to the United States land office in January, 1919. The plaintiff then filed his adverse claim, and commenced action to have the conflict determined within the time prescribed by law.

The trial court found that "The said locators of the Marietta lode mining claim, both in their notice posted on the claim and in their recorded notice, claimed 1,500 linear feet along said vein or lode, 1,000 feet in a southerly direction and 500 feet in a northerly direction from the center of the discovery shaft; that the northern boundary of the said Marietta claim was the south end line of the said Snowdrift lode mining claim, survey No. 4525, patented, and that corner No. 1 of said Marietta lode mining claim was on said boundary line of said Snowdrift lode mining claim, from said corner No. 1, whence said claim ran southerly to the southeast corner No. 2, westerly to the southwest corner No. 3, northerly to the northwest corner No. 4, and thence easterly to the place of beginning. That said claim as marked upon the ground includes approximately 1,650 feet along the said vein, 392 feet of which said vein runs northerly from the center of discovery shaft to the side line of the said survey No. 4525, the Snowdrift lode mining claim, and 1,240 feet southerly from said discovery shaft, making the said Marietta lode mining claim along the vein or lode excessive in length of 132 feet from the amount allowed by law; but said excess was not included in said location for the purpose of deceiving or defrauding any person, but was caused by inadvertence and mistake in measurement, and there was no infringement or encroachment upon the rights of others, the land covered by said excess being at the time of said location and for a long period of years thereafter on public domain of the United States. * * * The said plaintiff, prior to the marking of the boundaries of said Metalic lode mining claim, and following the statement only in the certificate of location of said Marietta lode mining claim, that the said locators claimed 500 feet in a northerly direction and 1,000 feet in a southerly direction from the center of discovery shaft, and without making any attempt to locate or become familiar with the corner stakes of the said Marietta lode mining claim, or to measure the length of said Marietta lode mining claim from the north end line thereof, in company with Dewey Davies,

who at that time was the successor in interest by purchase
of the interest of the locators Hill and Ferguson, and who had
not been present at the original location of the said Marietta
lode mining claim, measured a distance of 1,000 feet south-
erly from the center of the discovery shaft of the Marietta
lode mining claim for the purpose of determining the north-
ern boundary of the said Metalic lode mining claim, and for
the purpose of determining where he should establish his north
end line of his said Metalic lode mining claim, so that the
same should coincide with and conform to south end line of
the said Marietta lode mining claim, as located on the ground.
*  *  *  That upon the survey of said Marietta lode mining
claim for patent, it was discovered that the claim was excessive
in length, and for the purpose of making the claim conform to
the law the south end line of said claim was drawn in to that
extent that the said application for patent applied for 1,500
linear feet on the vein or lode of said Marietta lode mining
claim, and that after the southern end line of said Marietta
lode mining claim was so established, the said plaintiff claimed
that said Marietta lode mining claim, as so established by said
surveyor and application for patent, conflicted with his said
Metalic lode mining claim in an area of fifty-three one-hun-
dredths of an acre,  *  *  *  which said premises so in con-
flict form a part of the Marietta lode as originally marked and
staked on the ground, and lies within the lines of said Marietta
lode as surveyed, and for which patent is applied.''

And as conclusions of law the court found: ''That the origi-
nal location of the Marietta lode mining claim was valid, in
full force and effect at the time the plaintiff located his so-
called Metalic lode mining claim.  That the plaintiff, when he
located his Metalic lode mining claim, knew, or by the exercise
of reasonable diligence, could have known, the exact extent of
the premises located, staked, and marked upon the ground and
claimed by the defendant herein, and its predecessors in in-
terest, as the Marietta lode mining claim.  *  *  *  That when
the plaintiff located his so-called Metalic lode mining claim,

in establishing his end lines failed to make his north end line conform to the south end line of the said Marietta lode mining claim, as staked upon the ground, or otherwise; that the plaintiff in making the location of his alleged Metalic lode mining claim overlapped and infringed upon the surface ground and premises, which were not open to location and belonged to the locators and owners of the Marietta lode mining claim. That the defendant is the owner of and entitled to the possession of all of the lands and premises described in the complaint of plaintiff and the answer of the defendant as the area in conflict between the Marietta lode mining claim as surveyed and the Metalic lode mining claim as located, together with all the dips, angles, and spurs, privileges thereunto belonging, and the extralateral rights allowed by law.''

Under the facts as stated, question at once arises decisive of the case as to whether the defendant, whose predecessors in interest staked the Marietta claim upon the ground 1,675 feet in length and 1,283 feet in a southerly direction from the discovery shaft, claiming in the recorded certificate of location but 1,000 feet in a southerly and 500 feet in a northerly direction from the discovery shaft, may now claim and hold 1,108 feet in a southerly direction and 392 feet in a northerly from the discovery shaft.

Section 7365, Revised Codes of 1921, provides for the post- [1] ing of notice of location of a mining claim, sinking of a discovery shaft, marking of the boundaries on the ground, and requires a statement of the number of feet claimed along the course of the vein from the point of discovery. And section 7366 provides for the recording of the certificate of location in the office of the county clerk of the county wherein the claim is situated, within sixty days after posting the notice of location, which certificate must contain, among other statements: ''In the case of a lode claim, the direction and distance claimed along the course of the vein, each way from the discovery shaft, cut, or tunnel, with the width claimed on each side of the center of the vein.''

It is settled law that such statutory requirements must be substantially complied with. (*Gonu* v. *Russell,* 3 Mont. 358; *Hauswirth* v. *Butcher,* 4 Mont. 299, 1 Pac. 714; *Leggatt* v. *Stewart,* 5 Mont. 107, 2 Pac. 320; *Purdum* v. *Laddin,* 23 Mont. 387, 59 Pac. 153; *Walker* v. *Pennington,* 27 Mont. 369, 71 Pac. 156; *Baker* v. *Butte City Water Co.,* 28 Mont. 222, 104 Am. St. Rep. 683, 72 Pac. 617; affirmed in *Butte City Water Co.* v. *Baker,* 196 U. S. 119, 49 L. Ed. 409, 25 Sup. Ct. Rep. 211 [see, also, Rose's U. S. Notes]; *Hahn* v. *James,* 29 Mont. 1, 73 Pac. 965; *Wilson* v. *Freeman,* 29 Mont. 470, 68 L. R. A. 833, 75 Pac. 84; *Mares* v. *Dillon,* 30 Mont. 117, 75 Pac. 963; *Dolan* v. *Passmore,* 34 Mont. 277, 85 Pac. 1034; *Helena Gold & Iron Co.* v. *Baggaley,* 34 Mont. 464, 87 Pac. 455; *Butte Northern Copper Co.* v. *Radmilovich,* 39 Mont. 157, 101 Pac. 1078.)

The statute requires that the boundaries of a location shall [2, 3] be so definite and certain that, taking the discovery as ·the initial point, they may be readily traced; and the declaratory statement shall furnish such information that a person of reasonable intelligence may find the claim and run its lines. (*Hauswirth* v. *Butcher, supra; Gamer* v. *Glenn,* 8 Mont. 371, 20 Pac. 654; *Bramlett* v. *Flick,* 23 Mont. 95, 57 Pac. 869; *Leveridge* v. *Hennessey,* 48 Mont. 58, 135 Pac. 906.) In the case last cited, this court, speaking through Mr. Justice Sanner, said: "While neither mathematical precision as to measurements nor technical accuracy of ·expression is expected, the degree of accuracy that is required is indicated by the fact that the locator after his discovery had thirty days in which to definitely ascertain the course of the vein and mark his boundaries and thirty days more in which to file his declaratory statement describing his claim so that it could be identified. (*Sanders* v. *Noble,* 22 Mont. 110, 55 Pac. 1037.) That degree of accuracy is not met if the description given is so erroneous as to be delusive and misleading, as when the declaratory statement and the markings upon the ground do not even approximately agree as to the general shape of the

claim or as to any point, direction, or distance. (*Dillon* v. *Bayliss,* 11 Mont. 171, 27 Pac. 725.)''

The purpose of our statutory requirements relative to the location of mining claims is well stated in *Hauswirth* v. *Butcher, supra,* wherein the court said: ''Before there can be a valid location there must be a discovery. Taking the discovery as the initial point, the boundaries must be so definite and certain as that they can be readily traced, and they must be within the limits authorized by law. Otherwise their purpose and object would be defeated. The area bounded by a location must be within the limits of the grant. No one would be required to look outside of such limits for the boundaries of a location. Boundaries beyond the maximum extent of a location would not impart notice, and would be equivalent to no boundaries at all. A discovery entitles the person making the same to a mining claim, embracing the discovery, not to exceed 1,500 feet in length by 600 in width. Within these limits, if the boundaries are properly marked on the ground, and the location properly made and recorded, the grant of the government attaches, and third persons must take notice. But they would not be required to look for stakes or boundaries outside of, or beyond, the utmost limits of the location as authorized by the statute.

''As to the length of a mining claim, there must be a substantial compliance with the law, as there must in all other respects pertaining to the location. The claim in question, as shown by the stakes and boundaries thereof, is 2,000 feet in length, whereas the greatest length, as authorized by law, is 1,500 feet. If such a location could be sustained to the extent of 1,500 feet, where the rights of third persons had not intervened, which we do not decide, certainly, if such rights had attached, such a location would not protect 500 feet in length of claim more than the law authorizes by virtue of one discovery. A 1,500 foot claim cannot be shifted from one end to the other of a 2,000 foot claim, as circumstances might require, to cover the discovery of a third person within such

2,000 foot location. 'The object of the law in requiring the location to be marked upon the ground is to fix the claim, to prevent floating or swinging, so that those who, in good faith, are looking for unoccupied ground in the vicinity of previous locations, may be enabled to ascertain exactly what has been appropriated, in order to make their locations upon the residue. The provisions of the law designed for the attainment of this object are most important and beneficent, and they ought not to be frittered away by construction.' (*Gleason* v. *Martin White M. Co.,* 13 Nev. 462.)

" 'The locator should make his location so certain that the miners who follow him may know the extent of his claim, and be able to locate the unoccupied ground without fear that, when they have found a paying mine, the theretofore indefinite lines of some prior location may be made to embrace it.' (*Mt. Diablo M. & M. Co.* v. *Callison,* 5 Sawy. 449 [Fed. Cas. No. 9886; 9 Morr. Min. Rep. 616].) "

In the case of *Leggatt* v. *Stewart, supra,* the case of *Hauswirth* v. *Butcher, supra,* is reaffirmed, and an instruction given to the jury approved as follows: "The location must be so distinctly marked on the ground that the boundaries can be readily traced, and the court instructs you that a location 263 feet in length in excess of the ground allowed by law to be located is void for uncertainty, and defendants cannot claim to have sufficiently marked their boundaries, if their stakes include 1,763 feet in length."

In the case of *Flynn Group Min. Co.* v. *Murphy,* 18 Idaho, 266, 138 Am. St. Rep. 201, 109 Pac. 851, the supreme court of Idaho, speaking through Mr. Chief Justice Sullivan, in disposing of a case involving similar facts, laid down the correct principle applicable, in the following language: "The location notice of the Snowdrift claim provides that the lode claim extends from the point of discovery 700 feet in a northwesterly direction and 800 feet in a southeasterly direction. If the parties who located it in fact placed their stakes at the northeasterly and southeasterly corners of said claims so as to

take in more ground than called for in the notice, such excess was not and could not be legally included in that location. It is not left to the pleasure of the locator to adjust his boundaries when and where he likes within an excessive location when it will interfere with a subsequent locator.

"Counsel for appellant contends that a locator may cover or include within his location an excessive area of ground and hold it against the world until he gets ready to conform it to the area allowed by the mining laws or until he has the same surveyed for a patent. We recognize the rule that where a claim is excessive in area the location is not void unless the excess is so great as to impress the locator with a fraudulent intent. The intent of the law is to require the locator to make his location so definite and certain that from the location notice and the stakes and monuments on the ground the limits and boundaries of the claim may be readily ,ascertained, and so definite and certain as to prevent the changing or floating of the claim. This court held in *Burke* v. *McDonald,* 2 Idaho (Hasb.), 679, 33 Pac. 49, that where the boundary of a claim is made excessive in size with fraudulent intent, it is void; or if so large as to preclude innocent error, fraud will be presumed. (*Stemwinder Min. Co.* v. *Emma & L. C. Con. Co.,* 2 Idaho (Hasb.), 456, 21 Pac. 1040.)"

And in reaffirming this doctrine the supreme court of Idaho, in *Swanson* v. *Koeninger,* 25 Idaho, 361, 137 Pac. 891, said: "After a careful consideration of the decision in *Flynn Group Min. Co.* v. *Murphy,* we cannot escape the conclusion that it is based on the fact that a locator cannot claim a greater length in either direction along the ledge or lode than is called for in his notice of location. In that case, as in the case at bar, the location notice was posted at the discovery and not upon either of the end stakes, and the court said: 'Under that notice, he was only entitled to 800 feet in a southeasterly direction from the discovery point.' The location notice calls for 500 feet in a northwesterly direction from the discovery. The claim as surveyed for patent swings the northerly part

from an angle of about forty-five degrees to a straight north-
erly direction from the discovery point, so that the location no-
tice is misleading with respect to the adjoining claims on the
north, the extent of ground claimed northerly from the dis-
covery and with respect to the course of the vein, as well as
the direction from discovery. All these points together show
that the location notice, instead of performing the function
designed by law (that is to say, informing the public of the
precise ground claimed thereunder), misleads in every partic-
ular when it is made the basis of a claim to the ground in-
cluded in the patent survey. * * *

" 'The object of the law in requiring the location' of a
mining claim 'to be marked upon the ground is to fix the
claim, to prevent floating or swinging, so that those who in
good faith are looking for unoccupied ground in the vicinity
of previous locations may be enabled to ascertain exactly
what has been appropriated, in order to make their locations
upon the residue.' (*Gleason* v. *Mining Co.*, 13 Nev. 442;
*Book* v. *Justice Min. Co.* (C. C.), 58 Fed. 106; *Daggett* v.
*Yreka Min. & Mill. Co.*, 149 Cal. 357, 86 Pac. 968.) The wis-
dom of the rule laid down in these cases cannot be questioned,
as it is contrary to the policy and spirit of the mining laws
to permit a mining claim of excessive size to be staked and
then afford the opportunity for the stakes to be shifted at the
locator's pleasure to include ground proved to be rich in
mineral through the development of other ore bodies."

Mr. Lindley, in his work on Mines, third edition, section 362,
says: "Where a lode location is excessive and the area to which
a locator is entitled can be determined by measurements follow-
ing the calls for distances from the discovery contained in
the notice of location, it has been held that a subsequent loca-
tor may measure the ground cast off and locate the excess.
The notice of location, as a rule, specifies the linear distance
from the discovery point, and when it does not, the locator
can only claim 750 feet along the vein on each side of the
discovery notice. Obviously this is a method which the courts

would follow in casting off excess.'' (See, also, *Erhardt* v.
*Boaro,* 113 U. S. 527, 28 L. Ed. 1113, 5 Sup. Ct. Rep. 560
[see, also, Rose's U. S. Notes] ; *Bremlett* v. *Flick, supra.*)

The trial court attempted to justify its findings by asserting
[4]  that the ''Marietta'' claim, as marked upon the ground,
includes approximately 1,650 feet along the vein, 392 feet of
which runs northerly from the center of the discovery shaft
and 1,240 feet southerly from the discovery shaft, making
the ''Marietta'' ''along the vein or lode excessive in length
of 132 feet over the amount allowed by law; but such excess
was not included in said location for the purpose of deceiving
or defrauding anybody, but was caused by inadvertence and
mistake in measurement, and there was no infringement or en-
croachment upon the rights of others, the land covered by
said excess being at the time of said location and for a long
period of years thereafter, open, and public domain of the
United States.''

In making such findings, the court departed from the require-
ment of the statute and settled law, forbidding one from shift-
ing his claim in either direction along the length of the lode
from the point of discovery, so as to interfere with the rights
of others.  It is obvious that when the plaintiff and Dewey
Davies measured 1,000 feet southerly from the discovery shaft
on the Marietta to determine the end line of the Marietta,
they simply did what Thompson himself could have done under
the well-settled principles of law.  The fact that Dewey Davies,
who then claimed to be the sole owner of the ''Marietta,''
assisted Thompson in making the measurements to determine
the end line of the ''Metalic'' claim, simply emphasizes the
fair play which characterized the entire transaction.

In view of the facts and circumstances attending the loca-
tion of the ''Metalic'' claim by the plaintiff Thompson, the
findings and legal conclusions made by the district court were
manifestly unfair, unjust and erroneous.  The plaintiff was
assisted in locating the Metalic claim by Dewey Davies, who
was at the time in actual possession, and the claimant of

the "Marietta" claim, adjoining the "Metalic" on the north. Together they measured the distance southerly from the shaft of the "Marietta" claim, and fixed the north end line of the "Metalic" claim, with reference to that which Dewey Davies established as the south end line of the Marietta claim, and, although Davies knew the location of the corner posts of the Marietta claim, he made no reference to them, and did not point the same out to Thompson at the time the latter made the location of the "Metalic" claim. He produced the declaratory statement of the "Marietta" claim as recorded, and reference was made thereto exclusively for the purpose of establishing the south end line of the Marietta claim and the north end line of the Metalic. In fact, the length of the Marietta claim as staked on the ground was 175 feet excessive, and it is manifestly unfair and unjust to permit the defendant by amendment to shorten the distance to the north of the discovery shaft 108 feet and add the same to the south end, more especially in view of the excessive length of the claim as originally staked. The recitals in the declaratory statement as recorded in compliance with the law are, in our opinion, controlling as to the distance a locator claims on either side from the point of discovery of a quartz location along the course of the vein, in the absence of actual knowledge of the position of the location of the corners.

We are of opinion that the area in conflict was open for location under the laws of the United States and the statutes of Montana, at the time that Thompson made his location thereof, and that the district court was in error in making its findings of fact and entering judgment in favor of the defendant. The judgment is reversed and the cause remanded, with directions to enter judgment in favor of the plaintiff.

*Reversed and remanded.*

ASSOCIATE JUSTICES COOPER and HOLLOWAY and HONORABLE ROY E. AYERS, District Judge, sitting in place of MR. CHIEF JUSTICE BRANTLY, disqualified, concur.